EXHIBIT 1

| | |
|---|---|
| PITKIN COUNTY DISTRICT COURT<br>506 E. Main, Suite 300<br>Aspen, Colorado 81611<br>Telephone: (970) 925-7635<br><br>**Ian Mullin,**<br><br>Plaintiff,<br><br>v.<br><br>**Hyatt Residential Group, Inc.** f/k/a Hyatt Vacation<br>Ownership, Inc., a Delaware corporation; and<br>**Hyatt Residential Marketing Corporation,** a<br>Florida corporation,<br><br>Defendants. | ▲ **COURT USE ONLY** ▲<br><br>Case Number:<br><br>Division:        Courtroom: |
| **DISTRICT COURT CIVIL SUMMONS** | |

**TO THE ABOVE NAMED DEFENDANT: HYATT RESIDENTIAL MARKETING CORPORATION, a Florida corporation**

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court an answer or other response to the attached Complaint. If service of the Summons and Complaint was made upon you within the State of Colorado, you are required to file your answer or other response within 21 days after such service upon you. If service of the Summons and Complaint was made upon you outside of the State of Colorado, you are required to file your answer or other response within 35 days after such service upon you. Your answer or counterclaim must be accompanied with the applicable filing fee.

If you fail to file your answer or other response to the Complaint in writing within the applicable time period, the Court may enter judgment by default against you for the relief demanded in the Complaint without further notice.

Dated:_____8/9/13_____

/s/ Clayton E. Wire
Thomas D. Neville, Reg. No. 35011
Clayton E. Wire, Reg. No. 41717
OGBORN MIHM, LLP
1700 Broadway, Suite 1900
Denver, CO 80290
Telephone: 303-592-5900
Facsimile: 303-592-5910
thomas.neville@ogbornmihm.com
clayton.wire@ogbornmihm.com

**This Summons is issued pursuant to Rule 4, C.R.C.P., as amended. A copy of the Complaint must be served with this Summons. This form should not be used where service by publication is desired.**

JDF 600  R1-12    DISTRICT COURT CIVIL SUMMONS

PITKIN COUNTY DISTRICT COURT
506 E. Main,  Suite 300
Aspen, Colorado 81611
Telephone:  (970) 925-7635

**Ian Mullin,**

Plaintiff,

v.

**Hyatt Residential Group, Inc.** f/k/a Hyatt Vacation
Ownership, Inc., a Delaware corporation; and
**Hyatt Residential Marketing Corporation,** a
Florida corporation,

Defendants.

| | ▲   COURT USE ONLY   ▲ |
|---|---|
| | Case Number: |
| | Division:          Courtroom: |

## DISTRICT COURT CIVIL SUMMONS

**TO THE ABOVE NAMED DEFENDANT: HYATT RESIDENTIAL GROUP, INC. f/k/a Hyatt
Vacation Ownership, Inc., a Delaware corporation**

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court an answer or other
response to the attached Complaint.  If service of the Summons and Complaint was made upon you within
the State of Colorado, you are required to file your answer or other response within 21 days after such
service upon you.  If service of the Summons and Complaint was made upon you outside of the State of
Colorado, you are required to file your answer or other response within 35 days after such service upon you.
Your answer or counterclaim must be accompanied with the applicable filing fee.

If you fail to file your answer or other response to the Complaint in writing within the applicable time
period, the Court may enter judgment by default against you for the relief demanded in the Complaint
without further notice.

Dated:_____8/9/13_____

/s/ Clayton E. Wire
Thomas D. Neville, Reg. No. 35011
Clayton E. Wire, Reg. No. 41717
OGBORN MIHM, LLP
1700 Broadway, Suite 1900
Denver, CO 80290
Telephone: 303-592-5900
Facsimile: 303-592-5910
thomas.neville@ogbornmihm.com
clayton.wire@ogbornmihm.com

**This Summons is issued pursuant to Rule 4, C.R.C.P., as amended. A copy of the Complaint must
be served with this Summons. This form should not be used where service by publication is
desired.**

JDF 600   R1-12    DISTRICT COURT CIVIL SUMMONS

PITKIN COUNTY DISTRICT COURT
506 E. Main,  Suite 300
Aspen, Colorado 81611
Telephone:  (970) 925-7635

**Ian Mullin,**

Plaintiff,

v.

**Hyatt Residential Group, Inc.** f/k/a Hyatt
Vacation Ownership, Inc., a Delaware corporation;
and
**Hyatt Residential Marketing Corporation**, a
Florida corporation,

Defendants.

▲ COURT USE ONLY ▲

Case Number:
Div.:          Ctrm:

ATTORNEYS FOR PLAINTIFF

Thomas D. Neville, Reg. No. 35011
Clayton E. Wire, Reg. No. 41717
OGBORN MIHM, LLP
1700 Broadway, Suite 1900
Denver, CO 80290
Telephone: 303-592-5900
Facsimile: 303-592-5910
thomas.neville@ogbornmihm.com
clayton.wire@ogbornmihm.com

## COMPLAINT AND JURY DEMAND

Plaintiff, Ian Mullin, by his attorneys Thomas D. Neville and Clayton E. Wire
of Ogborn Mihm LLP, submits the following Complaint and Jury Demand, and
alleges as follows:

# I.  INTRODUCTION

1.      This is an employment lawsuit brought by Plaintiff Ian Mullin, a real estate broker registered to conduct real estate sales in the State of Colorado, against his former employer, Hyatt Residential Group, Inc., and Hyatt Residential Marketing Corporation (collectively "Hyatt"), based upon Hyatt's wrongful termination of Mr. Mullin, in violation of public policy.

2.      Mr. Mullin ran Hyatt's sales office at the Hyatt Grand Aspen location, and was responsible for transmitting offers from potential purchasers to Hyatt's corporate offices, with the understanding that Hyatt would then transmit those same offers to the group of individuals and entities that owned and had interests in the Grand Aspen location.

3.      However, Mr. Mullin soon discovered that Hyatt was in fact not transmitting all of the offers from potential purchasers to the owners of the Grand Aspen location.

4.      As a Colorado real estate broker, Mr. Mullin was statutorily required to timely submit all purchase offers to the owners of the Grand Aspen.

5.      Once Mr. Mullin discovered that Hyatt was not timely transmitting the offers, he took matters into his own hands, complied with his ethical requirements, and informed those with interests in the Hyatt Grand Aspen of the potential purchase offers his office had received.

6.      Just weeks later, Hyatt terminated Mr. Mullin for providing such information to representatives of the owners of the Grand Aspen location, which Mr. Mullin was ethically and professionally required to do.

7.      Essentially, Hyatt terminated Mr. Mullin for his refusal to violate the ethical standards that govern Colorado real estate brokers, which caused Mr. Mullin injuries and damages.

## II.  PARTIES

8.      Plaintiff Ian Mullin is an individual residing in Carbondale, Colorado.

9.      Defendant Hyatt Residential Group, Inc., is a Delaware corporation, registered to do business in Colorado, with a principal office street address of 71 S. Wacker Drive, 14th Floor, Chicago, IL 60606.

10.      Defendant Hyatt Residential Marketing Corporation is a Florida corporation, registered to do business in Colorado, with a principal office street address of 71 S. Wacker Drive, 14th Floor, Chicago, IL 60606.

11.     At all times relevant, Hyatt operated an office at and managed the sales of fractional ownership interests in the Hyatt Grand Aspen, located at 415 E Dean St., Aspen, Colorado.

## III.  JURISDICTION AND VENUE

12.     Jurisdiction is proper under § 13-1-124(1)(a) and (b), C.R.S. 2013, because this case arises out of Defendant's transaction of business and commission of torts in Colorado.

13.     Venue is proper pursuant to C.R.C.P. 98(c).

## IV.  FACTUAL ALLEGATIONS

### Mr. Mullin Begins Working at Hyatt

14.     Mr. Mullin began working for Hyatt on July 6, 2010, as the Director of Sales and Marketing at the Hyatt Grand Aspen location.

15.     Mr. Mullin was hired to manage the sales and marketing for the Grand Aspen property.

16.     Mr. Mullin's duties included hiring and training staff, training associate brokers, reporting sales, and personally selling units in the Grand Aspen as the lead broker for the property.

17.     As a duly licensed real estate broker, Mr. Mullin was and is subject to Colorado statutory provisions and regulations promulgated and administered by the Colorado Department of Regulatory Agencies (DORA).

### Mr. Mullin Manages the Sales Team at the Hyatt Grand Aspen Property

18.     Throughout his time at Hyatt, Mr. Mullin operated as a real estate broker, facilitating the sales of fractional ownership interests in the Hyatt Grand Aspen and other Hyatt properties.

19.     The purchasers of the fractional ownership interests in the Hyatt Grand Aspen were various individuals and companies.

20.     The seller of fractional ownership interests in the Hyatt Grand Aspen property was an investor group that owned and held interests in the Grand Aspen property (the "Ownership Group").

21.     The Ownership Group was made up of entities that had funded and facilitated the construction and development of the Grand Aspen property.

22.   Hyatt was retained by the Ownership Group to conduct the branded sales, marketing, and operations of and for the Grand Aspen property.

23.   Bald Mountain Development ("Bald Mountain") was the developer of the project, responsible for building the condominiums at the Hyatt Grand Aspen location, and was also a part of the Ownership Group.

24.   Hyatt provided capital and sales personnel for the Hyatt Grand Aspen project, and was also part of the Ownership Group.

25.   The Hyatt sales team, which Mr. Mullin managed, operated out of an office at the Grand Aspen property, interfaced with prospective purchasers, showed properties, received offers, and facilitated the closing of purchases of fractional ownership interests.

26.   When the Hyatt sales team at the Grand Aspen property received offers from potential purchasers of fractional ownership interests in the Hyatt Grand Aspen property, the sales team, including Mr. Mullin, would transmit such offers back to Steven Craig, the Managing Broker at Hyatt's corporate offices in St. Petersburg, Florida.

27.   Mr. Craig was responsible for transmitting the offers submitted by the Grand Aspen sales team to the Ownership Group, for approval or rejection.

28.   Once the Ownership Group agreed to accept an offer, David Parker, a principal in Bald Mountain, would sign the sales documents on behalf of the Ownership Group.

### Mr. Mullin Excels in His Position

29.   Although Mr. Mullin joined Hyatt during a severe decline in the national real estate market, he was able to achieve substantial results for Hyatt and the Ownership Group.

30.   As Director of Sales and Marketing, in 2010-2011 Mr. Mullin increased sales of the Hyatt Grand Aspen fractional ownership units by over 50%, when compared to the previous year.

### Hyatt Holds Mr. Mullin's Office Up As a Model for Fractional Ownership Sales Offices

31.   At the 2011 Ragatz Resort Real Estate & Fractional Conference, Ed Crovo, the Senior Vice President of Hyatt Residential Group, gave a presentation on the success of the Grand Aspen property.

32.     Mr. Crovo's presentation was under the program heading "Top Performers in the Fractional Industry 2010: How They Did It."

33.     During his speech, Mr. Crovo specifically cited Hyatt's sales team at Grand Aspen, of which Mr. Mullin was the director, as an example of excellent sales performance for fractional ownership.

34.     Mr. Crovo cited Mr. Mullin's focus on retaining and marketing to current Hyatt owners as a profitable strategy, stating that "[f]or [the Hyatt Grand Aspen] 2010 was the year of the owner. We concentrated on them, and we saw owner reloads representing 58 percent of our sales in 2010, and owner referrals another 25 percent."

35.     As a result of his performance, as noted in Mr. Crovo's speech, in 2011 Mr. Mullin received a merit and performance based bonus.

### *Mr. Mullin Raises Concerns with the Internal Policies of Hyatt*

36.     During his time at Hyatt Mr. Mullin began to question whether Hyatt was operating in good faith in its relationship with the Hyatt Grand Aspen Ownership Group.

37.     The primary goal for Hyatt is to sell potential purchasers on the entire portfolio of Hyatt Vacation properties, as members are entitled to use their timeshare points at other properties operated by Hyatt.

38.     It is in the Hyatt Grand Aspen Ownership Group's interest to sell the largest number of units possible, as that is the method by which their investment in the property will be successful.

39.     During Mr. Mullin's tenure with the company, Hyatt acted directly to achieve its own goal, at the expense of the Hyatt Grand Aspen Ownership Group's interests.

40.     Hyatt implemented a strategy to extend the sales cycle and timeline for the sale of the Grand Aspen units.

41.     Hyatt deliberately withheld certain purchase offers from the Hyatt Grand Aspen Ownership Group.

42.     The Grand Aspen property was Hyatt's most expensive and luxurious property.

43.     Purchasers at other Hyatt Vacation properties were often lured into the Hyatt system by their ability to use the Grand Aspen property with the points afforded by their purchase of cheaper properties.

5

44.     The ability to use the Grand Aspen property was used as marketing tool by Hyatt, to attract purchases at other cheaper properties.

45.     On multiple occasions, the fractional owners at the Grand Aspen property made it known to Hyatt that they did not see any value in being Hyatt Vacations members, and saw the use of the property by other members as a negative.

46.     Mr. Mullin also had concerns with Hyatt's lack of a set compensation plan for Mr. Mullin and his team.

47.     Representatives of Hyatt had forced one of Mr. Mullin's sales associates, Casey Orenstein, to retroactively reduce the commission she earned on the sale of a fractional interest in one of the Grand Aspen units, and to back-date the contract and other documents to accomplish this.

48.     In an email to Hyatt's human resources representative, Renee Kagimoto, Mr. Mullin raised his concerns with Hyatt's orders to Ms. Orenstein and the lack of an express compensation structure for Hyatt's sales staff.

49.     In Mr. Mullin's email to Ms. Kagimoto, he also expressed his concerns with the non-payment of promised bonuses to his sales team.

### *Mr. Mullin Provides the Ownership Group with Offer Information*

50.     In 2011, Mr. Mullin became concerned that Hyatt was not conveying all of the offers made on Hyatt Grand Aspen units to the Ownership Group.

51.     Mr. Mullin discovered that Hyatt executives, including Steven Craig, were unilaterally rejecting certain offers conveyed by Mr. Mullin's sales team without consulting the property ownership.

52.     After making this discovery Mr. Mullin engaged in numerous discussions with members, agents, and/or apparent agents of the Ownership Group regarding the offers that were coming into Hyatt's Grand Aspen office and that were communicated to Hyatt's corporate offices.

53.     On or about July 4, 2011, the office administrator for the Hyatt Grand Aspen, Holly Upper, met with Curtis Kaufman, one of the ownership partners regarding the sales of timeshare units and the loss of sales to the secondary market.

54.     In July 2011, Curtis Kaufman was an agent of the Ownership Group.

55.     The Ownership Group engaged in conduct that Mr. Mullin, Ms. Upper, and the other employees of the Grand Aspen office reasonably interpreted to

indicate that Curtis Kaufman was acting on behalf of the Ownership Group and/or that the Ownership Group consented to Mr. Kaufman acting on its behalf.

56.     Hyatt gave Curtis Kaufman consistent updates on the sales of fractional ownership of the Grand Aspen units even prior to Mr. Mullin becoming the manager of the Grand Aspen office.

57.     On or about July 4, 2011, Mr. Kaufman asked Ms. Upper to provide him with a comparison between the current "list" prices from Hyatt and the resale pricing on the secondary market.

58.     In the past, the previous Hyatt manager of the Grand Aspen office told Ms. Upper to provide this same information to individual time share owners and prospective buyers as a sales tool.

59.     On or about July 6, 2011, Ms. Upper sent an email to Mr. Kaufman with a "Resale Report" attached.

60.     This report contained information regarding Hyatt's current listing prices, the prices of Grand Aspen units on the secondary market, and the prices actually paid for Grand Aspen units on the secondary market.

61.     Prior to sending this email Ms. Upper and Mr. Mullin discussed sending the "Resale Report" to Mr. Kaufman, and Mr. Mullin approved the communication that occurred on or about July 6, 2011.

62.     Mr. Mullin was CCed on Ms. Upper's email to Mr. Kaufman on or about July 6, 2011.

63.     Mr. Mullin was also involved in an email exchange on or about July 7, 2011, between Ms. Upper and Mr. Kaufman, in which Mr. Kaufman requested more information regarding the pricing components of the report.

64.     The report sent by Ms. Upper to Mr. Kaufman at Mr. Mullin's direction contained information that Mr. Kaufman and the other members of the Ownership Group received on a monthly basis from Mr. Mullin's office.

65.     Following this email exchange, Mr. Mullin met with Mr. Kaufman and representatives of Bald Mountain, including David Parker.

66.     In these meetings Mr. Mullin discovered that many of the purchase offers that his office had received and conveyed to the Stephen Craig and Larry Shulman at Hyatt's corporate offices were not subsequently conveyed to the Ownership Group for acceptance or rejection.

67.     Bald Mountain's representative, Mr. Parker, expressed his concern that this was not the first time that Hyatt failed to convey purchase offers as a result of its desire to keep ownership levels curbed and only sell to purchasers participating in the Hyatt Vacations program.

68.     Over the next five weeks, from July 13 to August 18, 2011, Mr. Mullin communicated with Mr. Kaufman and Mr. Parker extensively regarding Hyatt's failure to properly convey purchase offers to the ownership partners.

69.     Mr. Mullin conveyed to Mr. Kaufman and Mr. Parker Hyatt's blatant disregard for the ownership partners' right to accept or reject reasonable offers.

70.     Mr. Craig had previously specifically instructed Mr. Mullin to inform a potential purchaser that "You work as employee of the marketing company not the developer," and that

> Our prices are the prices that were approved by ownership. It is our responsibility to present all offers to ownership however this unit was 35% off the approved price. The resale inventory should be less than our price as you do not have all of the same features...ie HGPP option and developer rental nights.

71.     Based on the information conveyed by Mr. Mullin, the Ownership Group requested that an audit of potential purchaser offers be performed at Hyatt's Grand Aspen office.

72.     When Mr. Craig and Mr. Shulman at Hyatt's corporate office received the Ownership Group's request for audit,  Mr. Craig and Mr. Shulman instructed Ms. Upper to create a report that buried the non-conveyed offers in with other data, in order to conceal Hyatt's wrongful conduct.

73.     Approximately one week after Ms. Upper's email to Mr. Kaufman, sent pursuant to Mr. Mullin's instruction, and Mr. Mullin's initial discussion of non-conveyed offers with Mr. Kaufman, Hyatt reduced Mr. Mullin's compensation plan and made his bonus incentives for 2011 unattainable.

### *Hyatt Summarily Terminates Mr. Mullin for Providing the Ownership Group Information Regarding Non-Communicated Offers*

74.     On or about August 18, 2011, Mr. Mullin participated in a conference call with Stephen Craig from Hyatt's corporate office and one of Hyatt's human resources representatives, Kynan Langenbeck.

75.     During this call, Mr. Craig informed Mr. Mullin that Hyatt was terminating Mr. Mullin's employment immediately.

76.     Hyatt's rationale for terminating Mr. Mullin's employment was because "Hyatt Grand Aspen owner Information, sales leads and Hyatt Grand Aspen pricing Information was Improperly provided to non-Hyatt employees."

77.     During this conference call, Mr. Craig specifically cited the emails between Ms. Upper and Mr. Kaufman on July 6 and 7, 2011, as evidence of this infraction.

78.     The July 2011 email chain between Ms. Upper and Mr. Kaufman, with Mr. Mullin CCed, was attached to the "Employee Disciplinary Notice" in Mr. Mullin's personnel file, which described Hyatt's rationale for terminating Mr. Mullin.

79.     During this conference call, Mr. Craig also stated that Hyatt had accessed Mr. Mullin's personal Gmail email account and discovered extensive communications between Mr. Mullin on one hand and Mr. Kaufman and Mr. Parker on the other.

80.     Mr. Craig cited these emails from Mr. Mullin's personal Gmail account as further justification for Hyatt's termination of Mr. Mullin.

**Hyatt Attempts to Cover-Up its Wrongdoing Through the Destruction of Evidence**

81.     After Mr. Mullin was terminated, the newly promoted administrative assistant at the Hyatt Grand Aspen sales offices[1] began destroying documents and electronic files regarding offers that were communicated by Mr. Mullin to Hyatt.

## V.  CLAIMS

### Claim For Relief:
### Wrongful Termination in Violation of Public Policy
(Against Defendant Hyatt)

82.     Plaintiff incorporates paragraphs 1 - 75 as if fully stated herein.

83.     Although Mr. Mullin was conveying all offers made by prospective purchasers of fractional ownership in the Grand Aspen property to Hyatt, through Mr. Craig and Mr. Shulman, many of these offers were not being subsequently conveyed to the Ownership Group of the Grand Aspen property.

---

[1] This administrative assistant was promoted after Holly Upper was terminated by Hyatt for engaging in actions similar to those of Mr. Mullin, *i.e.* complying with ethical requirements dictating that the Ownership Group should be informed of all purchase offers.

84.     Hyatt failed to make the Ownership Group aware of multiple offers that Mr. Mullin had conveyed to Hyatt's executives.

85.     Mr. Mullin was told by Hyatt's executives that he "work[ed] as employee of the marketing company not the" owners, and that certain offers would not be conveyed by Hyatt.

86.     Mr. Mullin refused to participate in Hyatt's withholding of prospective purchasers' offers.

87.     Mr. Mullin instead provided Bald Mountain and Mr. Kaufman with information regarding the sales figures for the units and with information regarding all offers he had received.

88.     Bald Mountain was an agent and/or apparent agent of the Ownership Group.

89.     Curtis Kaufman was an agent and/or apparent agent of the Ownership Group.

90.     Hyatt expressly and indirectly directed Mr. Mullin to participate in its illegal, unethical, and fraudulent withholding of purchase offers from the Ownership Group.

91.     Hyatt, including, but not limited to, Mr. Craig and Mr. Shulman, directly and indirectly ordered Mr. Mullin to violate the public policy clearly delineated in § 12-61-804(1)(c)(II) C.R.S. 2011, § 12-61-807(2)(b)(I) C.R.S. 2011, 4 CCR 725-1, and the language of the Colorado form real estate contracts.

92.     These sources of public policy state that a real estate agent has an ethical and legal obligation to "[p]resent all offers and counteroffers in a timely manner regardless of whether the property is subject to a contract for sale…" *See, e.g.*, § 12-61-807(2)(b)(I).

93.     The Colorado Association of Realtors has interpreted this obligation to require "Brokers must present offers in a timely manner regardless of whether the property is already under contract with another buyer.  This does not mean when it is convenient, it means as soon as reasonably possible."

94.     Mr. Mullin refused to follow Hyatt's directions to violate these clear public policies and instead acted consistently with these public policies.

95.     Mr. Mullin also internally complained to Hyatt that a Hyatt executive instructed one of the Hyatt Grand Aspen brokers to retroactively reduce the commission listed on a real estate contract.

96.     Hyatt terminated Mr. Mullin because he refused to participate in Hyatt's illegal, unethical, and fraudulent conduct.

97.     Hyatt terminated Mr. Mullin because he complied with his legal and ethical duties as a real estate broker, as detailed in the sources of public policy stated above.

98.     Mr. Mullin's personnel file reflects that Mr. Mullin was terminated for authorizing communications with and directly communicating with Mr. Kaufman regarding the sales and offers at the Grand Aspen property.

99.     Mr. Mullin objected to, refused to participate in, and externally blew-the-whistle on, Hyatt's failure to convey the purchase offers to the Ownership Group and Hyatt's directions to alter real estate contracts.

100.    Mr. Mullin was also immediately terminated following Hyatt's investigation of Mr. Mullin's conduct and disclosure of information to the Ownership Group.

101.    Hyatt was aware, or should have been aware, of the reason for Mr. Mullin's objection, nonparticipation and investigation relating to Hyatt's wrongful conduct, as Mr. Mullin was consistent in stating that he did not agree with, refused to participate in, and actively investigated Hyatt's wrongful conduct.

102.    Hyatt was also aware of Mr. Mullin's external reporting of its wrongful behavior because during the meeting regarding Mr. Mullin's termination Mr. Craig and Hyatt's HR representative specifically cited Ms. Upper's July 6 and 7, 2011, emails to Mr. Kaufman as a basis for Mr. Mullin's termination and indicated that Hyatt had accessed Mr. Mullin's Gmail account and gained other evidence that he had blown-the-whistle externally regarding the company's illegal, unethical, and fraudulent behavior.

103.    Hyatt terminated Mr. Mullin because of his refusal to participate in, external reporting of, internal reporting of, and failure to engage in, Hyatt's actions that directly violated clearly articulated Colorado public policy.

104.    As a result of Hyatt's wrongful termination of Mr. Mullin's employment, in violation of public policy, Mr. Mullin suffered and continues to suffer the following injuries: loss of back-pay; loss of front-pay; litigation costs; attorney fees; mental and emotional pain and suffering; and other consequential losses.

105.    The injuries caused by Hyatt's wrongful termination of Mr. Mullin's employment entitle Mr. Mullin to the following damages, in an amount to be established at trial: back-pay; front-pay; pre and post judgment interest; litigation

costs; attorney fees; consequential damages; loss of income; noneconomic damages; and other relief that the court may deem appropriate.

## VI.  PRAYER FOR RELIEF

106.    Plaintiff requests entry of judgment in his favor and against Defendant Hyatt as follows:

- An award of compensatory damages, including past, present, and future economic and noneconomic damages;

- An award of general damages;

- An award of special damages;

- An award of back-pay;

- An award of front-pay;

- An award of noneconomic damages;

- An award of consequential damages;

- An award of costs;

- An award of pre- and post-judgment interest at the maximum allowable rate;

- An award of attorney fees as permitted by contract and law; and

- Such other relief deemed just and reasonable.

107.    Plaintiff reserves the right to amend this Complaint to assert demands for punitive damages and relief as otherwise permissible.

## VII.  DEMAND FOR TRIAL BY JURY

108.    Plaintiff demands a jury trial on all issues so triable.

**DATED** this 9th day of August, 2013.

                                                         Respectfully submitted,

OGBORN MIHM LLP

                              */s/ Clayton E. Wire*

By:_____
Thomas D. Neville, Reg. No. 35011
Clayton E. Wire, Reg. No. 41717
OGBORN MIHM, LLP
1700 Broadway, Suite 1900
Denver, CO 80290
Telephone: 303-592-5900
Facsimile: 303-592-5910
Email:
thomas.neville@ogbornmihm.com
clayton.wire@ogbornmihm.com

*Attorneys for Plaintiff*

Plaintiff's Address:
4040 Crystal Bridge Dr.
Carbondale, CO 81623

13