IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 13-cv-2348-WJM-NYW

IAN MULLIN,

      Plaintiff,

v.

HYATT RESIDENTIAL GROUP, INC., a Delaware corporation f/k/a HYATT VACATION
OWNERSHIP, INC., and
HYATT RESIDENTIAL MARKETING CORPORATION, a Florida corporation,

      Defendants.

---

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Ian Mullin brings this action against Defendants Hyatt Residential Group,
Inc. and Hyatt Residential Marketing Corporation for wrongful discharge in violation of
public policy.  (ECF No. 22.)  This matter is before the Court on Defendants' Motion for
Summary Judgment.  (ECF No. 27.)  For the reasons set forth below, the Motion is
denied.

## I.  BACKGROUND

The following relevant facts are undisputed, unless otherwise noted.  The Hyatt
Grand Aspen ("HGA") is a luxury condominium resort owned by Grand Aspen Holdings,
LLC, a four-member limited liability corporation ("the Ownership Group").  (ECF No. 27
at 3-4.)  In 2004, Defendants contracted with the Ownership Group to act as its
marketing and sales agent for fractional interval ownership interests, commonly referred
to as timeshares, at HGA.  (*Id*. at 4.)  In June 2010, Plaintiff, a licensed Colorado real

estate broker, was hired by Defendants to act as the director of sales and marketing for timeshares at HGA.  (*Id*. at 3-4.)  When Plaintiff received a timeshare purchase offer, he would communicate that offer to his direct supervisor, Steven Craig.  (*Id*. at 4-5.)  Mr. Craig would then forward the offer to Larry Shulman, Defendants' vice president of sales and marketing, who would review the offer.  (*Id*.)  It was Plaintiff's understanding that Defendants, through Mr. Craig or Mr. Shulman, would then provide the purchase offers to the Ownership Group for consideration.  (*Id*. at 5.)

Plaintiff asserts that, as a licensed real estate broker, he had a statutory duty to ensure that all purchase offers were disclosed to the Ownership Group as the owner and seller of HGA timeshares.  (ECF No. 30 at 13.)  However, in July 2011, Plaintiff became concerned that the purchase offers he conveyed to Defendants were not being provided to the Ownership Group.  (ECF No. 27 at 5.)  Based on these concerns, on July 6, 2011 Plaintiff sent an email to Curtis Kaufman, who Plaintiff believed was part of the Ownership Group, which included HGA pricing information, and discounts and incentives provided to buyers for specific timeshare units.  (*Id*. at 6.)  The following week, Plaintiff authorized an employee of Defendants, Holly Upper, to forward similar e-mails to Mr. Kaufman regarding the pricing and incentives offered on HGA units.  (ECF No. 30 at 13-14.)  On July 20, 2011, Plaintiff attended a meeting with Mr. Kaufman and another Ownership Group representative, David Parker, during which Plaintiff addressed the concerns that certain offers were not being communicated to the Ownership Group, and disclosed offers he suspected had been withheld.  (*Id*. at 14.)  At the meeting, Plaintiff discovered that many of the purchase offers that he had received

2

and conveyed to Mr. Craig were not subsequently conveyed to the Ownership Group. (*Id*.)  Defendants admit that some of the purchase offers were not forwarded to the Ownership Group.  (ECF No. 27 at 5.)

Defendants terminated Plaintiff's employment on August 18, 2011.  (*Id*. at 8.) Defendants assert that they reached the decision to terminate Plaintiff due to concerns about Plaintiff's loyalty to Defendants, his alleged poor job performance, and Plaintiff's having  authorized Ms. Upper to e-mail the HGA pricing information to Mr. Kaufman, which was viewed as an unauthorized disclosure of proprietary information.  (*Id*.) However, Plaintiff alleges that he was terminated for communicating the withheld purchase offers to the Ownership Group, as he was required to do as a licensed real estate broker.  (ECF No. 22.)

On August 9, 2013, Plaintiff filed this action in the District of Colorado, Pitkin County, and on August 30, 2013, Defendants removed the action to this Court.  (ECF No. 1.)  Plaintiff's Amended Complaint alleges wrongful termination in violation of public policy against Defendants, along with a claim for exemplary damages.  (ECF No. 22.) On May 29, 2014, Defendants filed the instant Motion for Summary Judgment seeking dismissal of Plaintiff's Amended Complaint.  (ECF No. 27.)  Plaintiff filed a Response (ECF No. 30), and Defendants filed a Reply (ECF No. 35).

## II.  LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem*

3

*Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).  Whether there is a genuine dispute

regarding a material fact depends upon whether the evidence presents a sufficient

disagreement as to require submission to a jury or, conversely, is so one-sided that one

party must prevail as a matter of law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49

(1986); *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987).

A fact is "material" if it pertains to an element of a claim or defense, and a factual

dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a

reasonable party could return a verdict for either party.  *Anderson*, 477 U.S. at 248.

The Court must examine the facts in the light most favorable to the nonmoving party,

and resolve factual ambiguities against the moving party.  *Houston v. Nat'l Gen. Ins.

Co.*, 817 F.2d 83, 85 (10th Cir. 1987).  The summary judgment standard thus favors a

right to trial.  *See id.*

## III.  ANALYSIS

Defendants assert that Plaintiff cannot satisfy the necessary elements of

wrongful termination in violation of public policy.  (ECF No. 27.)  Specifically,

Defendants allege that (1) the real estate brokerage statutes on which Plaintiff relies

are not a legitimate expression of public policy; (2) Plaintiff cannot prove that he owed a

statutory duty to the Ownership Group or its alleged representatives with whom Plaintiff

communicated; and (3) Defendants terminated Plaintiff for valid reasons, and not

because Plaintiff engaged in any protected behavior, or refused to engage in any illegal,

fraudulent or unethical conduct.  (*See generally* ECF Nos. 27 & 35.)  The Court

discusses each issue below.

A.      Wrongful Termination in Violation of Public Policy

Absent an express contract providing otherwise, Colorado law presumes that an employment relationship is terminable at will by either party.  *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 105 (Colo. 1992).  However, termination of employment in violation of public policy is a common law exception to the at-will presumption.  *Id*. at 109.  An employee terminated for refusing to follow his employer's directive to engage in unethical or unlawful conduct could maintain a claim for wrongful discharge.  *Kearl v. Portage Envtl., Inc*., 205 P.3d 496, 498 (Colo. App. 2008).  Additionally, an employee terminated for engaging in conduct that is protected or encouraged as a matter of public policy may also have a viable cause of action.  *Id.*  It is this latter theory on which Plaintiff bases his claim for wrongful discharge in violation of public policy.[1]  (ECF No. 30 at 21.)

A plaintiff asserting wrongful discharge for exercising a job-related right must show "[1] that he or she was employed by the defendant; [2] that the defendant discharged him or her; and [3] that the defendant discharged him or her in retaliation for exercising a job-related right or performing a specific statutory duty, or that the termination would

---

[1]  Defendants argue that Plaintiff cannot raise this theory of liability for the first time in his Response to Defendant's Motion.  (ECF No. 35 at 11.)  Defendants state that they "framed their motion and submitted evidence based on [Plaintiff's] specific allegations that he was discharged for refusing to follow directives that violated public policy."  (*Id*. at 12.)  However, in Plaintiff's Amended Complaint, the relevant cause of action against Defendants is simply titled "Wrongful Termination in Violation of Public Policy."  (ECF No. 22 at 9.)  Although the claim does state that Plaintiff was terminated because he "refused to participate in [Defendants'] illegal, unethical, and fraudulent conduct" in withholding prospective purchasers' offers, Plaintiff also alleges, in the alternative, that he was terminated "because he complied with his legal and ethical duties as a real estate broker."  (*Id*. at 10.)  Therefore, Plaintiff's Amended Complaint can be read to encompass both theories of liability that could arise in a wrongful discharge in violation of public policy case, and Plaintiff may appropriately rely on the latter theory in responding to Defendants' Motion.

undermine a clearly expressed public policy."[2] *Kearl*, 205 P.3d at 499.  Additionally, the

plaintiff must allege that the "public policy invoked truly impacts the public in order to

justify interference into an employer's business decisions."  *Id*. (citing *Crawford Rehab.*

*Serv., Inc. v. Weissman*, 938 P.2d 540, 552 (Colo. 1997)) (quotation marks omitted).

Actions protected under the public policy exception are not confined to any one

category of behavior.  Rather, wrongful discharge in violation of public policy "has been

variously described as an action that involves a matter that affects society at large

rather than a purely personal or proprietary interest of the plaintiff or employer, leads to

an outrageous result clearly inconsistent with a stated public policy, or strike[s] at the

heart of a citizen's social rights, duties, and responsibilities."  *Weissman*, 938 P.2d at

552 (internal quotation marks and citations omitted).  In short, an employer is not

permitted to fire an employee in contravention of an important public policy, and, as a

corollary, an employee should not be forced to choose between violating the law or

losing his job.  *Lorenz*, 823 P.2d at 109.

     1.    <u>Whether Plaintiff's Claim Implicates Public Policy</u>

Defendants assert that the real estate broker statutes on which Plaintiff relies

merely reflect a broker's duties that arise from his private relationship with a seller of

real estate.  (ECF No. 27 at 14.)  Therefore, according to Defendants, any statutory

obligations imposed on real estate brokers only impact the seller involved in the

relevant transaction, not the general public.  (*Id*.)  The Court disagrees.

---

[2]  Defendants admit that they employed, and subsequently discharged, Plaintiff.  (ECF No. 27 at ¶¶ 1, 30-32.)  Therefore, the Court need not make any findings with respect to the first two elements.

Colorado's real estate broker statutes emphasize the importance of consumer protection and transparency in the purchase and sale of real estate.  In 1993, the Colorado General Assembly enacted "An Act Concerning Brokerage Relationships in Real Estate Transactions". Colo. Rev. Stat. §§ 12-61-801, *et seq*.  (the "Act").  The General Assembly's legislative declaration concerning brokerage relationships provides a clear statement of the Act's statutory goals:

> The general assembly finds, determines, and declares that the public will best be served through a better understanding of the public's legal and working relationships with real estate brokers and by being able to engage any such real estate broker on terms and under conditions that the public and the real estate broker find acceptable.  This includes engaging a broker as a single agent or transaction-broker.  Individual members of the public should not be exposed to liability for acts or omissions of real estate brokers that have not been approved, directed, or ratified by such individuals.  Further, the public should be advised of the general duties, obligations, and responsibilities of the real estate broker they engage.

Colo. Rev. Stat. § 12-61-801.  Thus, the Act's express purpose is to protect members of the public in their dealings with real estate professionals.

Real estate brokers are heavily regulated, and many of the major provisions in the Act focus on consumer protection.  For example, all Colorado brokers are required to be licensed.  Colo. Rev. Stat. § 12-61-102.  The licensure requirement serves to safeguard the public against those unfit to serve as real estate professionals.  Colorado law states that "[n]o person shall be granted a license until such person establishes compliance with the provisions of this [section] concerning education, experience, and testing; truthfulness and honesty and otherwise good moral character; and . . . competency to transact the business of a real estate broker in such manner as to safeguard the interest of the public." *Id*.

Moreover, the General Assembly has declared that the "the licensing of persons to sell condominiums and time shares is a matter of statewide concern." Colo. Rev. Stat. § 38-33-113.  Broker licenses are so important that not only is it unlawful to act in the capacity of a broker without first obtaining a license, but "[i]t is well settled that an agreement to compensate an unlicensed real estate broker is illegal and unenforceable." *Shotkoski v. Denver Inv. Grp. Inc*., 134 P.3d 513, 515 (Colo. App. 2006).  The licensing criteria, and penalties for failing to obtain a license, therefore all serve to shield the public in real estate dealings.

Those who meet the Colorado Real Estate Commission's ethical standards and obtain a license are required to comply with the Act's comprehensive brokerage guidelines.  In an effort to regulate the "full spectrum of activities related to the sale of real estate," *Brakhage v. Georgetown Assoc., Inc.*, 523 P.2d 145, 147 (Colo. App. 1974), a "real estate broker" is broadly defined as any person who, directly or indirectly, leases, sells, offers to sell, lists, or negotiates the sale of real estate for a fee.  Colo. Rev. Stat. § 12-61-101(2)(a).  A broker's violation of any provision contained in the Act could result in an investigation by the Colorado Real Estate Commission and administrative action against the broker, including revocation of his or her broker's license.  *Id*. at § 12-61-811; *see also* § 12-61-113(1).  All brokers must also obtain errors and omissions insurance in the event they breach the Act.  Colo. Rev. Stat. § 12-61-103.6.  The legislative history of § 12-61-103.6 "made it clear that one purpose of the [statute] was to provide the public a remedy against the wrongful acts of real estate professionals, in addition to the existing regulatory sanctions available to the Colorado Real Estate Commission."  Kenneth L. Levinson, *E&O Insurance: Mandatory for*

8

*Colorado Real Estate Professionals*, COLORADO LAWYER, September 1998.  The Commission's ability to suspend a broker's license, coupled with the errors and omissions insurance requirement, provides twofold consumer coverage.  The offending broker is potentially removed from the market, thus preventing further harm to the public, and the aggrieved consumer is made whole via the broker's insurance carrier.

Based on the Colorado General Assembly's legislative declaration and the provisions of the Act cited above, the Court finds that the Act "affects society at large rather than a purely personal or proprietary interest of the plaintiff." *Weissman*, 938 P.2d at 552.  Moreover, the specific portion of the Act on which Plaintiff relies also "strikes at the heart" of his responsibilities to the public as a real estate broker. *Id*.  It is clear that Plaintiff is a "broker" as defined in the Act, and was therefore obligated to comply with the Act's provisions governing brokerage relationships.  While the parties dispute whether Plaintiff was engaged as a transaction or single-agent broker, both types of relationships require the broker to present "all offers and counteroffers in a timely manner regardless of whether the property is subject to a contract for sale or lease or letter of intent." *Compare* Colo. Rev. Stat. § 12-61-804, *with* Colo. Rev. Stat. § 12-61-807.  This provision inures to the benefit of any seller of real estate, and reflects the broader goals of the General Assembly in achieving full disclosure in real estate dealings.  Therefore, the Court concludes that a broker who is allegedly fired for complying with the Act's disclosure rules can bring a claim against his employer for wrongful termination in violation of public policy.

While the parties have not cited, and the Court cannot find, any cases interpreting the Act in the wrongful discharge context, other Colorado cases provide a

9

helpful analogy that supports the Court's conclusion.  In *Rocky Mountain Hosp. and Med. Serv. v. Mariani*, 916 P.2d 519, 521 (Colo. 1996), the plaintiff was a certified public accountant who brought a claim against her employer for wrongful discharge in violation of public policy.  The plaintiff alleged that her employer engaged in questionable accounting practices that resulted in expenses not being properly reported to the Internal Revenue Service, or that otherwise misrepresented the business's financial status in violation of standard accounting procedures.  *Id*.  The plaintiff further alleged that she was fired solely because she objected to her employer's use of these improper accounting practices.  *Id*. at 522.  To support her claim, the plaintiff argued that the Colorado State Board of Accountancy Rules of Professional Conduct sufficiently implicated public policy for purposes of a wrongful termination claim.  *Id*. at 523.  The Colorado Supreme Court agreed.

In so holding, the court provided several reasons as to why the Board of Accountancy rules exhibited a clear expression of public policy, which are strikingly similar to the Court's findings regarding the Act:

> The Board [of Accountancy] has responsibility for making appropriate rules of professional conduct, in order to establish and maintain a high standard of integrity in the profession of public accounting.  These rules of professional conduct govern every person practicing as a certified public accountant.  Failure to abide by these rules may result in professional discipline.
>
> The rules of professional conduct for accountants have an important public purpose.  They ensure the accurate reporting of financial information to the public. They allow the public and the business community to rely with confidence on financial reporting.  . . .
>
> The legislature has endorsed these goals in . . . the legislative declaration for establishing the Board of Accountancy . . . [which] states in pertinent part:

10

> It is declared to be in the interest of the citizens of the state of Colorado and a proper exercise of the police power of the state of Colorado to provide for the licensing and registration of certified public accountants, . . . to provide for the maintenance of high standards of professional conduct by those so licensed and registered as certified public accountants.

*Id.* at 526. The Board of Accountancy Rules seek to achieve the same goals as the Act. Like the Accountancy Rules, the Act holds brokers to high ethical standards, which are maintained through the Real Estate Commission's thorough vetting of potential brokers and regulatory enforcement. The Act also ensures standardization across the profession to preserve the public's expectations regarding brokers and their duties. Finally, consumer protection is the centerpiece of the Act's legislative declaration. Public policy therefore permeates the Act and the brokerage profession, as it does in the accounting profession.

Furthermore, other states have found that their respective brokerage statutes significantly impact public policy. For example, in *Barratt v. Cushman and Wakefield of New Jersey, Inc.*, 675 A.2d 1094, 1096-97 (N.J. 1996), the plaintiff was a real estate broker who was discharged for reporting a competing broker's act of bribery to the state Real Estate Commission against his employer's wishes. In the plaintiff's suit for wrongful discharge, the court held that the real estate broker statutes at issue constituted clear mandates of public policy. *Id*. at 1100.[3] The court noted that brokers

---

[3] *See also RDP Dev. Corp. v. Schwartz*, 657 A.2d 301, 304 (D.C. 1995) (noting that the District of Columbia Real Estate Licensure Act "was enacted to revise the real estate licensure law to establish educational and other qualifications for real estate brokers . . . [and] to provide increased protection to the public against incompetence, fraud, and deception in real estate transactions") (citations and internal quotation marks omitted); *Mo. Real Estate Comm'n v. Berger*, 764 S.W.2d 706, 709 (Mo. App. 1989) (holding that a real estate broker must maintain "his reputation for honesty, integrity and fair dealing [and] his competence to transact the

11

are heavily regulated, and "[t]o protect the public, the [Real Estate] Commission licenses brokers, investigates complaints of misconduct, and conducts disciplinary proceedings." *Id*. Moreover, the competing broker's act of bribery negatively impacted the public perception of all brokers. *Id*. If not reported to the Commission, such "unethical or illegal conduct could lead others astray and subvert public confidence in real estate brokers." *Id*. Similarly, if Plaintiff in this case ignored his statutory duty to promptly report all offers to a given seller, such conduct could, in the aggregate, reflect adversely on the brokerage profession as a whole.

For all these reasons, the Court holds that the provisions of the Act relied on by Plaintiff in this case involve matters which affect society at large, and are sufficient to form the basis of a claim for wrongful discharge in violation of public policy.

2.      Whether Plaintiff was Subject to, and Performed, a Statutory Duty

Defendants raise three arguments that Plaintiff did not owe the Ownership Group any statutory duty, contending that Plaintiff has failed to present evidence showing (1) that he owed the Ownership Group any statutory duty to convey offers; (2) that Parker or Kaufman were representatives of the Ownership Group; or (3) that his communications with Parker and Kaufman were in furtherance of any statutory duty. (ECF No. 35 at 12.)  The Court discusses each argument below.

———————————

business of a broker or salesperson in such manner as to safeguard the interest of the public"); and *Ranquist v. Stackler*, 370 N.E.2d 1198, 1203 (Ill. App. 1977) (holding that the "predominant purpose of the State in licensing [real estate brokers] is the prevention of injury to the public by assuring that the occupation will be practiced with honesty and integrity, excluding from the profession those who are incompetent or unworthy").

a.     *Whether Plaintiff Owed a Duty to the Ownership Group*

Defendants assert that Plaintiff did not act as an agent or broker for the Ownership Group or HGA because he was never engaged by either to perform any brokerage services.  (*Id*. at 13.)  Instead, Plaintiff was employed solely by Defendants.  (*Id*. at 10.)  Therefore, Defendants argue that Plaintiff owed no statutory duties to the Ownership Group or HGA.  (*Id*. at 13.)  Plaintiff admits that he had no written agreement with HGA to act as its broker.  (ECF No. 30 at 3.)  However, Plaintiff asserts that he acted as a transaction-broker and complied with the duties imposed on such brokers under the Act.  (*Id*.)

A real estate broker may act as a single agent or transaction-broker.  Colo. Rev. Stat. § 12-61-803(1).  A single agent broker is engaged by, and acts as the agent for, only one party in a real estate transaction, whereas a transaction-broker assists one or more parties "without being an agent or advocate for the interests of any party to such transaction."  Colo. Rev. Stat. § 12-61-802(4), (6).  Brokers are considered to be transaction-brokers unless an agreement exists to the contrary that establishes a single agency relationship.  Colo. Rev. Stat. § 12-61-803(2); *see also Ludlow v. Gibbons*, 310 P.3d 130, 141 (Colo. App. 2011), *rev'd on other grounds* ("By statute, a broker defaults to the role of transaction broker").  Although a transaction-broker is not in an agency or fiduciary relationship with any party, he must still comply with various obligations under the Act.  One such obligation is to "[p]resent[ ] all offers and counteroffers in a timely manner regardless of whether the property is subject to a contract for sale or lease or letter of intent."  Colo. Rev. Stat. § 12-61-807(2)(a)(I).

13

The statute is silent on exactly to whom the broker is to present purchase offers, and the Court has not located any cases that address this issue.  Statutory interpretation is a question of law.  *People v. Terry*, 791 P.2d 374, 376 (Colo. 1990).  The Court's primary task is to give effect to the spirit and intent of the General Assembly in enacting the statute.  *Moody v. Corsentino*, 843 P.2d 1355, 1370 (Colo. 1993); *see also Schubert v. People*, 698 P.2d 788, 793 (Colo. 1985) ("Legislative intent is the polestar of statutory construction").  To do so, the Court must look to the statutory language itself.  *Moody*, 843 P.2d at 1370.  "When that language is clear and unambiguous there is no need to resort to interpretative rules of statutory construction, and the court must apply the words according to their commonly accepted and understood meaning."  *Id*.  When the language is not clear, the statute should be construed "as a whole to give a consistent, harmonious, and sensible effect to all of [its] parts."  *Adams Cnty. Sch. Dist. No. 50 v. Dickey*, 791 P.2d 688, 691 (Colo. 1990).

Here, in a departure from traditional common law principles of agency, the General Assembly created the role of "non-agent" or "intermediary" broker when it passed Colorado Revised Statute § 12-61-807.  *Barfield v. Hall Realty, Inc*., 232 P.3d 286, 291 (Colo. App. 2010).  Nevertheless, transaction-brokers "have a relationship with both the buyer and the seller" without being an agent for either.  Patricia A. Wilson, *Nonagent Brokerage: Real Estate Agents Missing in Action*, 52 OKLA. L. REV. 85, 90 (1999).  The extent of this relationship is reflected in the multitude of duties imposed on transaction-brokers for the benefit of buyer and seller alike.  *See generally* Colo. Rev. Stat. § 12-61-807.  One particular provision requires the transaction-broker to disclose

"*to any prospective seller* or landlord all adverse material facts actually known by the broker." Colo. Rev. Stat. § 12-61-807(2)(b)(VII) (emphasis added). Similarly, the benefit of the duty to disclose purchase offers also logically flows to the seller itself, rather than to any intermediaries such as Defendants in this case, despite the statute's failure to specifically mention the term "seller." This interpretation gives consistency to § 12-61-807 in the context of the Act as a whole. Moreover, it is evident that one primary aim of § 12-61-807 is to ensure that the broker keeps the buyer and seller fully informed regarding the transaction. Preserving transparency in real estate dealings goes to the heart of the Act, and accordingly echoes the spirit and intent of the General Assembly in passing the legislation.

Additionally, all transaction-brokers are required to comply with § 12-61-807(2)(a)(I). Thus, even if Plaintiff was never hired by Defendants, the Ownership Group, or HGA, and worked solely for prospective buyers of HGA timeshares, his duty to communicate offers to the seller would remain unchanged. The Court finds that, absent an agreement to the contrary, Colorado Revised Statute § 12-61-807(2)(a)(I) requires that transaction-brokers communicate all offers and counteroffers directly to the seller of real property.

b.    *Whether Parker and Kaufman were the Sellers of HGA*

Defendants argue that, even assuming Plaintiff was statutorily obligated to convey purchase offers to the Ownership Group, Plaintiff nonetheless failed to comply with his statutory duty. (ECF No. 35 at 14-15.) Prior to his termination, Plaintiff attended a meeting with Kaufman and Parker, who Plaintiff believed were members or agents of the Ownership Group, during which Plaintiff disclosed certain purchase offers

15

he believed had been withheld.  (ECF No. 30 at 13-14.)  Plaintiff also authorized e-mails to Kaufman that contained information regarding the HGA timeshares.  (*Id*.)  Defendants assert that Parker and Kaufman were not the sellers of HGA timeshares, nor were they agents of the seller or acting on its behalf.  (ECF No. 35 at 14-15.)  Defendants thus argue that Plaintiff was not acting in furtherance of his statutory duties because he never communicated with the actual seller of HGA.  (*Id*. at 15.)

Defendants' argument is not supported by the record.  In their Motion, Defendants state that Kaufman held a non-voting membership in Grand Aspen Affiliates, LLC, one of the four corporate members that comprised the Ownership Group, Grand Aspen Holdings, LLC, which in turn owned HGA.  (ECF No. 27 at 6.)  Parker was also a member of Grand Aspen Affiliates, and served as its representative in meetings with the Ownership Group.  (*Id*.)  Kaufman's and Parker's membership in Grand Aspen Affiliates indicates that they were part of the Ownership Group, and, as a result, that each held an interest in HGA.  Their respective interests further support the conclusion that each maintained some form of agency relationship with HGA.

Agency "is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."  *Stortroen v. Beneficial Fin. Co. of Colorado*, 736 P.2d 391, 395 (Colo. 1987) (citing Restatement (Second) of Agency § 1(1) (1957)).  An agency relationship need not be contractual, and "may exist even though the parties do not call it an agency and do not subjectively intend that legal consequences flow from their relation."  *Id*.  In some situations, an agent's authority can be delegated to a

16

subagent.  *Id*.  A subagent is an agent of both the delegating agent and the principal.
*Id*. at 396.  "Notice to an agent given in the course of a transaction which is within the
scope of the agency is notice to the principal.  So too, notice to a subagent who is
under a duty to communicate the notice to the agent is effective to the same extent as if
notice had been given to the agent."  *Id*.

Viewing the evidence in the light most favorable to Plaintiff, Parker and Kaufman
could each be classified as either agents of HGA and the Ownership Group, or as
subagents of Grand Aspen Affiliates, which itself was an agent of HGA and the
Ownership Group.  In either case, Plaintiff's communication of the withheld purchase
offers to Parker and Kaufman can be imputed to the Ownership Group as the ultimate
seller of HGA timeshares.

The existence of an agency relationship is usually a question of fact.  *Id*. at 395.
Based on the limited record in this case, the Court concludes that a material issue of
fact exists as to whether Kaufman and Parker could be considered the "seller" of HGA
based on their respective ownership and/or investment interests in the Ownership
Group, and by extension, in HGA.  The Court therefore finds that a reasonable jury
could find that Plaintiff satisfied his statutory duty as a transaction-broker when he
disclosed the purchase offers to Kaufman and Parker.

c.  *Whether Plaintiff Performed a Statutory Duty*

Defendants lastly argue that Plaintiff only conveyed the offers to the Ownership
Group to investigate whether Defendants had done so themselves.  (ECF No. 35 at 15.)
Defendants appear to argue that Plaintiff's motive for conveying the offers was
improper, and not in furtherance of his statutory duty.  However, the statute simply

17

provides that a transaction broker is obligated to "[p]resent[ ] all offers and counteroffers in a timely manner regardless of whether the property is subject to a contract for sale or lease or letter of intent."  Colo. Rev. Stat. § 12-61-807(2)(a)(I).  The statute states nothing about a broker's motive or subjective intent for disclosing the offers.  Rather, a broker complies with the statute when he discloses the offers, regardless of any additional reasons for doing so.  The Court concludes that summary judgment is not appropriate on this basis as well.

       3.     <u>Whether Plaintiff was Discharged for Performing a Statutory Duty</u>

       Defendants state that Plaintiff was discharged for legitimate reasons, not for complying with the Act.  (ECF No. 27 at 15-16.)  However, Plaintiff has submitted evidence contradicting this assertion.  For example, throughout July 2011, Plaintiff had e-mails sent to Kaufman containing HGA timeshare information, and eventually met with Kaufman and Parker on July 21, 2011 to discuss offers that had been withheld. (ECF No. 30 at 13-14.)  Shortly thereafter, on August 18, 2011, Defendants terminated Plaintiff.  (ECF No. 27 at 8.)

       Moreover, Plaintiff asserts that he had a stellar sales record prior to his termination.  (ECF No. 30 at 38.)  HGA had aggregate sales of $8,860,250.00 during the roughly 13 months that Plaintiff supervised the HGA sales team from July 2010 through August 2011.  (*Id*. at 8.)  The sales figures were lower for at least 18 months both before and after Plaintiff's employment with Defendants.  (*Id*.)  Based on the temporal proximity between Plaintiff's disclosure of the purchase offers and his termination, coupled with evidence of Plaintiff's strong performance as the HGA sales manager, a reasonable jury could infer that Plaintiff was terminated based on his

18

compliance with the Act.  *Cf. Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179

(10th Cir. 1999).  It is therefore clear that a dispute of material fact exists as to whether

Plaintiff was discharged for a lawful reason, as Defendant contends; this dispute can

only be resolved by a jury, and not on the papers submitted to this Court.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS that Defendant's Motion for

Summary Judgment (ECF No. 27) is DENIED.

Dated this 9th day of March, 2015.

BY THE COURT:

_____

William J. Martínez
United States District Judge